Wilk *v.* Mt. Oliver Borough, Appellant.

Argued April 28, 1943. Before KELLER, P. J., BALD-RIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*Walter J. Wagner,* for appellant.

*L. Pat. McGrath,* for appellee.

OPINION BY KELLER, P. J., July 16, 1943:
A reading of the evidence in this record satisfies us

that the defendant's negligence and the plaintiff's contributory negligence were questions of fact for the jury, and that the verdict, which established the former and rejected the latter, was amply justified; in fact, we can find no warrant in the testimony to sustain any other verdict than for the plaintiff.

Margaret Street is a public highway in the Borough of Mt. Oliver, running in an easterly-westerly direction. It is paved with brick, except the last fifty feet at the extreme eastern end, which was opened for travel some years later and has a dirt surface. The paved street is twenty-two feet wide between curbs, with a five foot sidewalk on each side. When the brick paving was laid in 1912, the street ended with the paving, and a line of posts was placed across it, at short intervals, to bar further travel. There was a steep grade downwards east of these posts. Four catch basins, to dispose of the surface water—two on each side—were placed laterally at points along the street, where the curb would otherwise have been; one basin was placed about fifteen feet west of the end of the paving, and the other about fifteen feet west of the first catch basin. They were found inadequate to carry away the surface water, which overflowed and made gullies in the hill to the east. So in 1918, two additional sewers or catch basins were installed at the end of the paving, one on each side of the street, but these were not placed laterally as the others were, but transversely into the street, at right angles to the curbs,—with the top or iron frame of the sewer at the curb level—and extended four and one-half feet into the street from each curb. The basin to collect the water and carry it into the sewer was six feet long and was depressed nine inches below the street at the western end, (fifteen inches at the curb), and had a down grade of eighteen degrees, while the grade of the street was eight degrees at that point, so the basin got deeper as it approached the sewer opening, where, the plaintiff and his witness

stated, it was eighteen inches deep. Some time later—by June 1939, at least—the borough opened the street for fifty feet more by filling in ground, but did not pave the extended portion. The barrier of posts was moved fifty feet eastward, leaving a steep declivity to the east of the newly opened portion of the street; but the transverse sewers and catch basins were not moved with the posts, but were left just as they were when the street ended there. This condition left the travelable roadway of the street at that point, and for a distance of six or seven feet, only thirteen feet wide, each catch basin and sewer occupying forty per cent of its half of the roadway. To one not familiar with the situation it created a veritable trap, especially at night, for, although it was testified that there was a street light in the center of the street extending from a pole on the south sidewalk, seventy feet west of the end of the paving, a man who lived close by said it was dark there (36a); and an automobile driver traveling eastward would have no reason to expect a bottleneck of this type, and the depth of the catch basins would be in the shadow; and the *defendant's* engineer witness said he was unable to state how far the light would show on a misty, rainy night.

On June 15, 1940, at 9:30 o'clock of a misty night, when it was raining hard, the plaintiff, Wilk, was driving his automobile eastward on Margaret Street. He had never been on it before and did not know it was a dead-end street or had these transverse sewers and catch basins in it. He wanted to get on a cross street leading to Ormsby Avenue. There was no sign or warning erected to show that the street came to a dead end and did not intersect any cross street. He was driving a couple of feet away from the south curb. When he came near the point we have described there was a parked truck, which took up most of the south half of the street, so he turned to his left in order to pass it. He could see a garage on the left of the street

(which faced on the unpaved portion of the street) but did not see the sewer extending out into the street or the catch basin emptying into it. "The street was wet and it appeared black and it looked level" (p. 29a). As the borough engineer testified that drainage into this basin "comes from a point 2,500 feet west of the end of the street", and it was raining hard at the time, it was probably filled with water and would look level. The top of the sewer inlet was black iron. At the time, plaintiff said he could see no difference between the paved and unpaved portions of the street. As he was veering towards the right to get back to the right hand side of the street again, the left front wheel of his car slid into the hole of the basin on the left and he hit the edge and top of the sewer with the left front wheel and the radiator of his car, stopping it and badly damaging the car. The damage done was described as follows: The left front wheel, the oil pan, knee action, windshield and radiator grill would have to be replaced by new parts; the frame was buckled and bent and would have to be straightened.

We have described the circumstances at this length, because without any further elucidation they are clearly sufficient to support the verdict.

The only other point raised on appeal is trivial. It relates to the evidence as to damages.

Plaintiff's witness, Sorenson, an expert on car values whose qualifications were admitted by defendant, testified that the fair market value of the car before the accident was $225 (plaintiff had placed the value at $250). This witness also fixed the salvage value of the car after the accident at $50, which is what plaintiff sold it for as junk. Sorenson also testified that if the car had been repaired its value in its repaired condition would be $50 less than it was before it was wrecked. It is frequently the case that an automobile with a badly damaged frame is not worth as much, and will not sell for as much, after it is repaired as before the

accident. See *Bauer v. Armour & Co.*, 84 Pa. Superior Ct. 174, 178-9; *Horton v. Phila. R. T. Co.*, 94 Pa. Superior Ct. 553, 555-6; *Price v. Newell*, 53 Pa. Superior Ct. 628, 630 (not the syllabus); *Wolf v. Altoona & L. V. E. Ry. Co.*, 92 Pa. Superior Ct. 259, 262. A competent repair man gave an estimate of $123.40 for the repairs necessary, but the plaintiff did not think it worth while to spend that much on a repair job on a car five years old. The verdict was for $175. While the charge of the court might have stated somewhat more fully the legal measure of the damages to which the plaintiff was entitled, no harm was done the defendant. The defendant offered no testimony on the subject and the evidence supported the verdict.

The admission in evidence of the estimated cost of repairs necessary to restore the car to running condition, did the defendant no possible harm; it supplied an estimate of damage lower than the verdict, which the jury might have adopted if they had found that the car could be repaired so as to be as good as it was before the accident. In *Crowley v. Snellenburg*, 89 Pa. Superior Ct. 263, we reversed a verdict for the plaintiff and ordered a new trial because there was no competent evidence as to the value of the automobile *after the accident.* We there said (p. 265) : "Evidence as to the cost of repairs was not *necessary* if the car could not be restored to its former good condition or if such expense exceeded the difference in value of the car before and after the accident." We did not say it would not be *admissible,* where those questions might arise. See *Rice v. Hill*, 315 Pa. 166, 172, 172 A. 289; *Wolf v. Altoona & L. V. E. Ry. Co.*, supra, 262.

The assignments of error are overruled and the judgment is affirmed.